Number 21-20435 United States of America, Ex-Royal Karen Minoude v. Houston Housing Authority Let's see it out. Number 21-20435. We'll hear first from Michael Adams, her title. May it please the Court, Michael Adams Hurta for Appellant and Relator Karen Minix. This is a case with years of materially false certification at Houston's Housing Authority in reckless disregard of HUD's procurement regulations and rules, and then made worse almost by an additional fraudulent scheme where the Housing Authority brought in property management companies who were not qualified and who then split bids up to avoid further oversight. Yet the District Court over-read and over-extended our procedural rules to dismiss this meritorious case, really precisely the type of case that Congress sought to allow. There are numerous issues in this case. I'm going to focus on several. First, the Inspector General's audit that happened before the suit was filed was not a civil suit or an administrative civil money penalty proceeding, and thus cannot be barred by Section 3730E3. Second, the public disclosure bar also cannot bar the complaint at this stage. And then finally, Ms. Minix pled her case as to all the defendants with particularity according to just normal pleading rules and Rule 9b. But first with the audit from the HUD Inspector General, that is not a civil money penalty proceeding. Just a plain reading of the text makes that clear, Your Honors. First, there is no penalty involved. At most, there was a request for really just a suggestion from the Inspector General that HUD request repayment for some money. That's it. There's nothing more there. In fact, the Inspector General has no power under the governing statutes or any of the Inspector General's or HUD's governing regulations to institute a penalty himself. There must be other members to institute such a penalty. This part reason that it's not a civil money penalty proceeding was recently echoed, in fact, after we filed the briefs by the D.C. Circuit and U.S. Ex-Rel Vermont National Telephone v. North Star Wireless. As to the penalty part of the equation, I believe the D.C. Circuit really gets it right there. There actually was a proceeding that the FCC was going through, but the D.C. Circuit recognized that the FCC had no authority to assess any penalties during that proceeding, and therefore it was not barred. But there's a second reason, too, that the audit is— That's a case you say was decided after the briefing. Is this something your 28J had noticed? We did submit a 28J letter, Your Honor. Your bottom line is an audit doesn't equal an action. Correct. It doesn't equal—and the statute doesn't use the term action. Courts often call this the government action bar. But yes, the audit does not equal a civil money penalty proceeding. And the district court cited no case suggesting it does. The district court didn't really go through a detailed analysis, but the district court, in Judge Hughes' opinion, pretty just clearly said that its analysis was believing that the Inspector General did have authority to issue—or that a penalty could come up and thought it was a civil money penalty proceeding for that reason. A look at the governing statute shows that that's not really the case. And particularly, you know, there is a statute for penalty proceedings through 31 U.S.C. 3803, and the only time the Inspector General is named there is in an investigation that occurs before then a recommendation is made up the chain, and eventually the Attorney General or Assistant Attorney General, quote, shall transmit a written statement which specifies that the initiation of a proceeding under this section is appropriate. So that statute makes clear that the Inspector General's involvement is pre-proceeding, which is really our second reason, beyond there being no penalties here, that this is not a civil money penalty proceeding, is that this just isn't a proceeding at all. And, you know, really if you look at the definition of proceeding and the plain reading of proceeding, you know, that needs to be either somewhat judicial light or quasi-judicial or, you know, adversarial in some sense. And there's none of that here. This is just a review. In fact, if you open the pages of the audit and look at kind of the opening lines of the audit, they selected auditing the housing authority just based off of their normal audit plan and risk analyses. Were the parties given an opportunity to respond to it in any way? There was a draft audit report that the housing authority was allowed to respond to before the final report was issued. The final report was based upon the conclusions of the housing authority after they received the arguments, testimony, or evidence of the parties. Well, Judge Jolly, only the conclusions of the inspector general and not the conclusions of the housing authority as a whole. The inspector general's conclusions there were then really only to make a recommendation to the housing authority upon which, you know, the housing authority could do what it wants with those recommendations. So it's a big comprehensive report, but it's not a civil monetary penalty? Correct, Your Honor. By virtue of how comprehensive it is about the HHA's failures, then that does walk into the second issue, correct? Yes, Your Honor. That walks into the second issue, which is public disclosure, which the district court did not decide anything on public disclosure, Your Honor. But I believe public disclosure can be, although this court can easily just remand for consideration of that issue because the court did not decide it, I think on the exception to the public disclosure rule, this court can very easily dispose of that issue because Ms. Minix is really a prototypical original source under the statute. She was general counsel and director of procurement. That's how she learned of all the allegations that she made. It was direct and independent knowledge from her own experience there. She certainly had the position to learn of things in advance, but if you just do a straight record comparison audit to her complaint, what is the new compelling material fact about the HHA's deficiency that they didn't get cost estimates? What would you say to us in her complaint points to a fact they didn't disclose in the audit? About that particular part, Your Honor, just about the independent cost estimates, it's really there's a lot of additional scienter allegations that Ms. Minix brought. As this court surely knows, scienter is often one of the hardest parts to prove in any case, and Ms. Minix had a lot of information about scienter that she provided, not only just generally that she gave warnings to the housing authority and that they ignored them, but they didn't just ignore them. The report says here is every detail about how they weren't getting cost estimates, so it's fully disclosed publicly, and then she says, yeah, I was right in the middle of it, and we sure knew that. That doesn't seem like a new compelling material fact. The government's disclosed that it was happening. She's just saying I was there and you're right. It's more than saying you're right because saying you're right to the audit is just saying, well, you're right. All that there needs to be is a repayment. No harm, no foul. Repayment, and everything is stated clean. What she's providing is the indicia of False Claims Act violations. What's your best case? I'm interrupting just because you're good and time runs out. What's your best case that that added sort of flavoring is the original source gets her into that world? The Read the Keypoint Government Solutions case from the Tenth Circuit, particularly at page 760 in that case, it discusses some of the information that that relator added that materially adds to the public disclosure and some of that materially added information was scienter information, Your Honor. I also believe, Your Honor, that Ms. Minnix provided information about the property management companies. But that's separate, right? Because he took care of those in terms of particular. That's correct, Your Honor, but I believe you could consider that in the original source analysis. Okay. That that is. Hasn't been done, fact intensive. Right. And so which brings me to the, as my, you know, with my remaining time remaining to the 9B issues, particularly as to the property management companies, but also to the housing authority. You know, if you look at Grubbs, Your Honor, then you see that, you know, 9B especially is a context-specific rule, and particularly with the False Claims Act, that context is really important because, unlike other fraud cases, you know, there's not a reliance element. There's no damages element. And so, you know, as long as you kind of, as long as you plead a scheme that gives a reliable indicia that false claims were made, then that is sufficient particularity. In fact, Reliable indicia can't be between this date and four years later, bad things happened, right? So I thought that the judge is saying you didn't ever particularize by defendant dates, contracts, specific money gotten from the government. So where are the reliable indicia? So a couple points, Your Honor. First, we believe that because the bid splitting that the property management companies engaged in, that was identical conduct between all of them. This circuit has not spoken on that particular scenario, but I believe that under, you know, if you look at a combination of Rule 8 and Rule 9b and kind of weigh those interests together, with identical conduct being done by multiple defendants, not just that they have separate roles in the scheme, but they are really doing the same thing, you can plead that all of them are doing that identical conduct. And that bid splitting is part of, is a big kind of indicia there, but it's not just we also pled, Ms. Minnick also pled, promises and false statements that they made themselves, that they made promises in their contracts with the housing authority, that they would follow the general compliance laws generally, and that they would specifically follow the HUD's procurement regulations specifically, including another, you know, on ROA 656, there's another statement in there, in that sample contract, about soliciting cost estimates and doing competitive bidding. So we have all of that about promises made, and we have the allegation that they completely lacked any understanding of those regulations that they recognized. Doesn't that under, like focusing on Allen and, what's Allen and Ally? So, Orion, Your Honor. If your argument is they misunderstood the regs, doesn't that undercut the notion they had a state of mind to submit false statements? Your Honor, no, that does not, because the standard under the False Claims Act is, although it uses the word knowingly, it defines knowingly as reckless disregard. And, you know, if you know that it's important to follow certain regulations and specific regulations, and then you still lack understanding. I thought you just said that, and I thought the pleading likewise, was that these property management contractors misunderstood the regs, not that they were deliberately indifferent or recklessly, willfully blind. But you're saying her pleadings would say to us? The facts of the pleadings support reckless disregard, Your Honor, in that a combination of that they misunderstood these regulations, but they also acknowledged promise to follow them and acknowledged their importance in the sample contracts that we attached. They acknowledged the importance of those contracts specifically for receiving federal benefits. So, and the Ola Properties case from this court is really our best case for showing that that type of, you know, lack of understanding of something that you recognize is important to follow, that that supports reckless disregard. And so in all of those senses, you know, we believe really that the false statements and false claims were directly pled as well. And so that clearly, we think, satisfies Rule 9b. The housing authority, the property management companies, you know, focused on materiality and scienter and their briefs. In materiality, we think the, we pled both of those condition of payment, which goes towards materiality, that following these particular regulations were conditions of payment. Second, I think the HUD audit is actually, you know, that might be an intensive fact issue in trial, but that's actually evidence of materiality as well. And then we just— In the papers to Judge Hughes, you gave him the Grubbs case and the Grubbs framework, correct? Yes, Your Honor. We did, and we don't believe he really followed that, you know, that analysis correctly. So the last kind of point, though, is if this court doesn't agree with the pleading standards, this, I want to emphasize, this was, although it's labeled the third amended complaint, this complaint was the first complaint served on any defendants in this case. This case had been under seal for years, and there were some, with the prior judge, Judge Atlas, there was some issues that are still under seal that were discussed, and that's why there were some amendments. How would you amend the complaint, if you were given an opportunity to amend it? How would you amend it so that it would, in fact, state a cause of action? So, Judge Jolly, I can't tell you everything. Part of that would depend some on this court's opinion if this court thinks we did not plead with materiality or plead with specificity. Sorry, Your Honors. But I can tell you a few things. One, we could plead a lot more scienter information. Our original complaint shows Ms. Minnix has a lot more knowledge about scienter to plead. That is in the record. Two, if you look at, for example, our response to the Lind Group, Lind Group's motion to dismiss, we attached some other documents there, and really kind of on ROA 1226, you can see, we are really pleading that connection. We can plead that connection with each property management company more specifically with each of them. We could also plead, for example, specific properties where they engaged in bid splitting and delineate them out. Those are a few examples. Did you ask the court to be allowed to amend your complaint? So we asked the court to amend our complaint and a couple of our responses, and then we also asked a motion for rehearing after the court. This court has said that normally a 9B dismissal is with leave to amend. He dismissed with prejudice immediately, and so we asked for reconsideration after that to ask for a chance to amend. I see my time is out, so if there are no more questions for now, I'll wait until my rebuttal. Thank you. Mr. Appel? Thank you, Your Honor. May it please the court, Bill Helfand for the Houston Housing Authority. I would be remiss if I didn't start off my remarks by thanking my co-appellees for allowing me some time to speak to these issues. They are here, though, if the court has specific questions for counsel or for any of the individual appellees. But the district court's finding that Section 3730E3 barred this suit, obviously in earnest to the benefit of all of the appellees, and it should be affirmed by this court. In parsing the language of the exception, the appellant loses sight of the fact that this court has repeatedly said that the goal of all of the FCA limitations is to avoid parasitic lawsuits, specifically that merely feed off previous disclosures of fraud. That's the public disclosure bar. No, it's actually all of the FCA limitations, Your Honor, the public disclosure bar as well. Also the first to file a bar. Excuse me. It's just very difficult. Judge Hughes, his own opinion is not a model of particularity. He cites one case, nothing to do with these issues. He cites no supporting authority for the notion that an audit is, in fact, a civil money penalty proceeding. Do you agree with all that? He cites no law to support that. The audit falls within the ambit of the E3 exception, as a number of courts have pointed out and has set up forth in the briefing. But in this particular case, it's so obviously a parasitic lawsuit. I'm not asking about the parasitic larger. You say there are a number of courts that have said that an audit standing alone qualifies under E3. What's your best circuit case that says that? Well, it depends on how you characterize audit, Judge, but I would point the court to a brief at page 21, from the Gately versus the City of Port Huneim, where in a HUD audit, the district court dismissed finding that the KeyTam claim seems to remedy alleged fraud that the government had already remedied to its satisfaction. That was a HUD case. And in a DOL case, at page 26 of the HHA's brief, is the Foundation for Fair Contracting case. So they both stand for the proposition that audit alone, no action, no filing, nothing coercive, actually can support? A determination of money owed and a payment of that money in response to that, yes. A determination? There are audits, to my recollection, which found that money was owed back to, in one case, the Housing and Urban Development and in the other, the DOL. And in which case, those monies were paid. And that actually brings me to the point, Judge, the problem with the argument that Appellant offers is that if the audit is not sufficient, then there are two problems that arise out of that. First of all, the government would always have to go through some enforcement mechanism which would thwart the whole goal of prompt resolution of disputes, particularly where liability may be denied. For example, in the Foundation for Fair Contracting case, the respondent argued that they didn't owe the money, but they paid it anyway to avoid the dispute. Obviously, our system finds benefit to that, to the government. When the government brings that claim and it's paid promptly, that should not then be the springboard for a key TAM action based upon the same conduct simply because the government did not go through a penalty enforcement proceeding, which is what the Appellant sponsors here. The other problem with the Appellant – But this was your argument to Judge Hughes. I'm sorry, Judge? In spite of the statutory language needing a penalty proceeding, we actually don't need a penalty proceeding. Again, it depends upon how this court interprets penalty proceeding. I'll get to it in a moment, but I respectfully submit that Appellant's reference to the North Star case is not of any help to this court. Well, you've given us your best cases, and you decide where you want to go. I would love to hear your thoughts on us deciding independently in the first instance something is fact-specific as to whether she is or isn't an original source. I would submit both the Gately case and the Foundation for Fair Contracting case speak to that issue. The problem with the Appellant's citation to the D.C. Circuit's recent decision in the North Star case is that the D.C. Circuit specifically found that what the FCC was considering there was a licensing procedure and money owed based upon a licensing procedure, not recovery of debt to the government, whereas in Gately and Foundation for Fair Contracting, the court was addressing both. They are both district court opinions, but as I said, they point out both that the argument that Appellee sponsors would actually thwart efforts to resolve, the government's efforts to resolve these claims promptly and expeditiously because they'd have to take them to the next step. Now, as the district judge in this case pointed out and the judges pointed out in those other two cases, a penalty proceeding is the result of a refusal to repay, and that gets back to the question that Judge Jolly asked. First of all, I think Councilman spoke. He said that the Office of Inspector General's audit report is just a recommendation to the Housing Authority. It's not a recommendation to the Housing Authority. It's a finding on behalf of HUD of money owed by the Housing Authority. But it has no coercive effect itself. Not at the time of the audit report, there is no coercive effect, but as the district judge pointed out in this case and the judges have pointed out in Gately, the courts have pointed out in Gately and Foundation for Fair Contracting, a refusal to repay that money leads to the coercive efforts of the government. And again, it brings me back to the point, we should not require the government to go to coercive steps when it can gain cooperation. Judge, can I ask you, what was your participation in that report? Were you able to offer your views, your defenses . . . Were you able to offer your views and your dissent to the report itself, before they reached a final amount that they were demanded. It's less a matter of view in this case, if I may judge, because it's accounting. But HHA was permitted to provide documentation showing the expenditures that were being audited. It started with a consideration of $10 million of expenditures. The OIG then questioned about $4 million in expenditures and warned of the potential for repayment of about $4 million. Houston Housing Authority was then permitted to provide documentation, which reduced the number down to $347,000. So ultimately, the government found $347,000 . . . Are you telling me then that the Housing Authority had an opportunity to present its argument about what it owed and what it did not owe? Again, if you think of the accounting records as argument, yes. But again, it's really a matter of strict accounting. It was documentation for payments made. All right. Well, I assume the Housing Authority would have some position that would mitigate the amount that was being demanded by HUD. They did, Judge. But they had no opportunity. You're telling me they had no opportunity to assert its arguments at that point, because it was strictly an accounting procedure. Is that right? But it's an accounting procedure that, of course, involves the Housing Authority. They have to provide the information to the OIG to get that number from $10 million to $4 million down to $347,000. But that's subsequent to the audit. Sorry, Judge? Or does the audit keep getting revised? That little exchange that you're describing out getting to a final number is as a result of the audit, not contained within the audit. Exactly. The conclusion of the audit is $347,000. The other problem with the appellant's argument here is also expressed in the Foundation for Fair Contracting case, and that is that not only would it thwart the prompt resolution of claims, but it would essentially allow another recovery for the same conduct. And Judge Fish, back in 1997, addressed this in the Stone v. Amwell Savings Association case. It's cited at page 16 in the brief in which he pointed out that the appellant's lawsuit here is simply an effort to make another recovery based upon what the OIG audit found. Unless there be any doubt, the court need only look at the complaint to see that the appellant repeatedly points out that she is suing over what the OIG found, to the extent of actually copying the OIG's findings. Are you shifting to the public disclosure bar now? I beg your pardon, Judge? This argument is more public disclosure bar, correct? This certainly reaches the public disclosure issue, and let me open and close that door pretty quickly, Judge. Yeah, and the best way to open it would be to tell me of a circuit authority where we decide that, not a district court. On public disclosure? Yes. I don't have that on my notes, and I don't know if I'll have the time since I'm not coming back. But you can see why he suggested that if we were going to go that route, that Judge Hughes didn't, whether she's an original source is a pretty fact-intensive question. Let me resolve that, if I may, simply by the basic pleading standards. Counsel said she is the, quote, prototypical original source. But it's those kinds of blanket conclusory statements that are in the complaint with no pleading facts that would identify her as an original source. She could claim to be an original source, but consistent with just basic pleading under Twombly and Iqbal, she was not— She was general counsel, correct? I thought she was general counsel. I can't remember the answer. I mean, there's a lawsuit because she was improperly fired for disclosing other fraud, so she was— But knowing the information and being the original source are not the same thing under— I know, but Judge Hughes hasn't explored any of this. She could have access to the information, but she's not alleged facts showing she made a report, and that's a basic 12b-6 pleading failure. I don't have any time left, but I'm going to— Except I do want to mention the one thing that came up in 9b. Judge Higginson, you asked appropriately. The OIG report found that the PMCs, the contractors, misunderstood the contracting rules, and here's perhaps the biggest problem with the 9b, the effort to dodge 9b by the appellant. This is not a case in which the appellant, like in many cases, a plaintiff, a relative, is claiming that these are payments that were requested, payments the government made, and those were fraudulent. Here, rather, what the appellant has continually said is everybody agreed to follow contracting rules and payment rules, and then they didn't, so that the appellant now wants to back into the argument that that is somehow fraudulent. The OIG found that the parties misunderstood, and that is not reckless disregard and certainly is not intentionality. Thank you for the opportunity. Thank you, sir. Mr. Allen Russell. May it please the court, Dylan Russell for J. Allen Management, but I'm also going to try to answer questions for all of the management companies as well as the city of Houston. I'd like to focus my time on three issues. First, repleting. Second, the issue of vicarious liability. And third, the issue of knowing intent because I think those should be dispositive for the court's opinion for at least those parties. As to repleting, I think counsel mentioned that, well, this was the first complaint that was served. I don't think they've cited any authorities that suggest you only count the first pleading that was served. Of course, there was, between the original and first amendment complaint, there was a year that passed. Between the second and third amendment complaint, there was another year that passed. And then after the city of Houston, which I believe filed the first motion to dismiss, nine months passed between when the court ruled on the motions to dismiss and Miniax filed a motion for reconsideration. And none of those responses, other than a mere request to replete in the alternative, in the event the court finds the pleading insufficient, did Miniax attach what would have been her fourth amended or fifth version of the complaint. And that was significant to this court in the Rosenzweig case. And Barry also makes the point that if you don't at least state what new facts would be alleged if given the opportunity, that the court, in this case the district court, was well within its discretion to deny the opportunity to replete. On the issue of vicarious liability, the allegations are about as minimal as you can get. As to the city of Houston, the mere fact that the mayor appoints the board of commissioners, that somehow that causes the city to be responsible for all of this tort activity they alleged. They cite to three cases, none of which support the proposition that everything the authority does somehow binds the tort liability of the city of Austin. Those cases, in fact, provide protections, whether it's the appraisal district case, the school district case, or the, I think it's another case involving the city of San Antonio involving their water work system. In all three of those cases, the status of being an agent gave protections against having to pay taxes, having to have tort liability under the Texas Tort Act, and then as well the obligation to pay an appeal bond. All of those things provide a protection. This would be the first case that would hold that everything that a housing authority does causes the city to have liability. As for the property management companies, other than the statement that they entered into these management agreements, there's no discussion about the actual language of those management agreements and the language of the management agreements, at least the ones that were attached as exhibits to the Third Amendment complaint. All state that the personnel of those management companies are not agents of the authority, and I think there's some statements in the OIG report stating that it is independent, and I think statutorily, as it relates to the city of Houston, the statute is pretty interesting. It says, this is 392.011A, says that the authority is created in the present tense, so therefore it's the statute that creates the existence of the authority, not the finding that the city has to make. That's 392.011F. The city shall find that there is a need for authority if certain factors are found to exist, so the city is being compelled under the Texas Code Construction Act to make the findings if they in fact exist, which then by statute under 392.011A is created, the authority is created, so the argument that the city decided to create the authority and therefore it should be responsible doesn't hold water. As to what I think is probably the most dispositive issue in this case, which is the failure to plausibly plead knowing intent, and I know Judge Higginson raised that issue, didn't these findings that there was a lack of understanding about the regulations cut against whether the knowing intent standard was met, and I think that absolutely is correct, and I think there's really five pages in the record that point that out, both as to the authority's findings, I'm sorry, the authority's potential knowledge, and that is page 607 of the record is the conclusion in the OIG report stating that the reason the regulations were not followed is because the authority's internal controls were not adequate and its staff did not understand HUD regulations, and then as it relates to the property management companies, the same allegation was made on page 555 of the record that the PMCs did not understand the regulations, and if you don't understand the regulations, I don't know how you meet even the lowest standard of knowing state of mind, which would be reckless disregard, and counsel opened with the statement that there was scienter and reckless disregard. Other than stating the definitions, the three definitions of knowing, including the third, probably the easiest to meet, reckless disregard for the truth or falsity, there's actually no discussion of that standard anywhere else in the complaint. There's no facts that suggest, ah, here's those facts that show this is reckless disregard, and I think that would not meet the plausibility standard, which would apply to the knowing test, but here's the five pages in the record in addition to the two that are, I'm sorry, five pages, three of which I haven't mentioned yet that I think close the door on this knowing intent. Specifically pages 681 to 682 and 686, and these are specifically exhibits L and M attached to the third amended complaint. Exhibit L, and these are all the few handful of emails that Ms. Miniaks forwarded to herself in the, you know, six or seven month period before she was terminated in December of 2016. So she had all this time between March of 2016 when the power, when there was the delegation to the property management company, so there was a nine month period where she was able, sitting in that seat as general counsel, to send all the information she could find while the HUD audit report was about to be finished in December, at the end of December of 2016, and she sends one email that was titled, possible issues. You couldn't find a better example of not meeting the standard required. If things are a sheer possibility, that is not meeting the Twombly standard, and that's the title of the email, and they follow that up by saying, don't know how much truth there is to what Bill is saying. I would suggest auditing some of the files. So they don't know themselves whether there's any kind of knowing fraudulent scheme. And so, and then there's another email that's just like that, 686. I want to say in my last 15 seconds, three cases, Bollinger, Shipyard, Farmer, and Grubbs, all show that this case, the mismanagement, the negligence, the gross negligence, this is really a Farmer case, not the scheming doctors in the Grubbs case, or the CEO in Bollinger, Shipyards. This is not a knowing intent case. All of the property management companies and the city of Houston should be dismissed. Unless the court has any more questions, or any questions. Thank you. Thank you, sir. Mr. Adams, you have four minutes on the clock. Thank you, Your Honor. I have three brief points to make in response to about the FCA's bars, procedural bars, and then about the intent points of the property management companies. First, opposing counsel opened up with discussions about the purpose of these bars. But if we look, if this court decides to look at purpose at all, it should look at the 1986 amendments, which established E3, and this court has said that the purpose of those amendments was to encourage and make easier more FCA suits by relators. And then if you look at the statutory history, what existed before and what existed after, you see that this bar, E3, is a lower version of a much smaller subset of what existed before. There was the government knowledge bar before, that just if the government knew about allegations, that that barred anything. And that's why Congress really cabined this in E3 and a little bit in E4 for public discussion. Could you give specific response to his assertion that the DOL case, and I think it was the Tenth Circuit, directly equated audits alone? So, yes, Your Honor. I'll respond to those. First, those were both district court cases. Second, the Gately case that involved HUD, both those cases were also much more adversarial. They did not use the word audit in those opinions. They discussed investigations of sorts, but those were more adversarial investigations. I think they're wrong. Those district courts don't look at the plain meaning of the statute, but also they are closer than this case is in that they are investigations in response to a complaint. In the Gately case, there was even a cease and desist letter, really adversarial. And in the Foundation for Fair Contracting case, the court found that there were regulations that supported penalty authority that just don't exist here. So that's my response to those. Mike, one quick point on original source is if this court decides to do original source, Judge Higginson mentioned the concern that it's a FAC-intensive issue, and I agree. If this court decides that issue now, it should be just on the pleading standard and that Ms. Minnix did plead a case, a plausible case, that she is the original source. Of course, it's now an affirmative defense. HHA can bring up the public disclosure bar again at summary judgment if they wish. And finally, as to the Rule 9b issues and the pleading issues, opposing counsel mentioned the scienter issue as what he believed to be dispositive. I'll quickly point out that 9b, of course, says that knowledge and scienter can be pled generally. But beyond that, you know, I don't believe that opposing counsel's arguments discredit ours. One additional pleading that I forgot to point out earlier is that we pled not only lack of understanding of the contracts, which is reckless disregard, but in ROA 555, Ms. Minnix pleads that they awarded these contracts arbitrarily, which is also, I believe, an indicator of intent. It also adds to the exhibits that were cited.  In fact, you know, so while there was that possible issues email, that was the first allegation of fraud that ever came across Ms. Minnix's desk as to the bid splitting. And then a week later on September 21st, ROA 789, Bill Bryant comes in and confirms a lot of those issues. And then Ms. Minnix investigates. You see on ROA 792 an email involving that investigation. Unfortunately, her investigation, you know, she is terminated soon after. That's in November. She's terminated in December. So again, though, if this court disagrees, we believe, you know, freely amend with 15A. And, you know, really the equities of this case merit at least one chance to amend. If there are no questions, then I cede my time and ask for this court to reverse. Thank you, sir. That concludes the final case for today. This court will adjourn until 9 o'clock the whole morning.